FILED

01/14/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0574

DA 22-0574

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 7N

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

CHARLOTTE ANN WOLFCHILD,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC-21-6
Honorable Ashley Harada, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Pete Wood, Attorney at Law, Boise, Idaho

      For Appellee:

      Austin Knudsen, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Helena, Montana

      Scott Twito, Yellowstone County Attorney, John M. Ryan, Deputy County
Attorney, Billings, Montana

Submitted on Briefs:  September 11, 2024

Decided:  January 14, 2025

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Charlotte Ann Wolfchild (Wolfchild) appeals the August 17, 2022 Judgment (Judgment) entered by the Thirteenth Judicial District Court, Yellowstone County, which ordered Wolfchild, in relevant part, to pay $44,450.50 to Scott Lantz (Scott or Mr. Lantz) or the Estate of his late wife, Faith Justice Lantz (Faith or Ms. Lantz), in restitution for damages related to Wolfchild's assault of Faith, which led to Wolfchild being charged herein with felony assault with a weapon. Wolfchild contends the restitution was erroneously imposed. We consider whether the restitution award was supported by sufficient evidence, and whether the District Court properly made the award to "Scott Lantz or the Estate of Faith Justice Lantz." We affirm in part, and reverse and remand in part.

¶3 Faith began work as the property manager at Sage Towers in Billings in November 2020. On December 30, 2020, one of the tenants of the facility called Faith, informing Faith that she was afraid to leave her apartment because of the presence in the building of Wolfchild, who the tenant reported had assaulted her two days prior. Wolfchild did not reside in the building. Faith located Wolfchild in another tenant's apartment and asked her to leave. Wolfchild, who had been drinking, began swearing and resisted Faith's request. Faith stated she would have to call police, and Wolfchild challenged her to do it, which

2

Faith did. Pursuant to a company policy, Faith accompanied Wolfchild to the elevator to escort her out of the complex. While waiting for the elevator, Wolfchild decided to leave by the stairs, and shoved Faith, which Faith reported on the call to police. The elevator arrived at the floor, whereupon Wolfchild turned around and entered the elevator, followed by Faith. Saying, "I'll show you what an assault is," Wolfchild repeatedly struck Faith in the face with a bar glass. The tenant who Wolfchild was visiting told Wolfchild to stop because "you're going to kill her," to which Wolfchild replied, "she deserves it." Police arrived and arrested Wolfchild. The District Court found:

> Ms. Lantz was never the same after being brutally attacked. Ms. Lantz was diagnosed with early onset cataracts in her right eye due to the assault. She suffered near constant, debilitating headaches for months after the assault. Mr. Lantz testified and described significant changes in the behavior of Ms. Lantz and the need to provide constant care for her. Mr. Lantz was forced to leave work to provide constant care for Ms. Lantz. Ms. Lantz had extreme psychological trauma from the attack and struggled with feeling safe. Ms. Lantz['s] doctors also noted that her traumatic brain injury resulted in her inability to work, her inability to feel safe, her inability to engage in normal daily routines, and her post concussive behaviors.

¶4    While the case was pending, Faith was admitted to the hospital for COVID-19, and her treatment was complicated by her traumatic brain injury. Scott could not be in the hospital with Faith due to pandemic protocols, and she succumbed to the infectious disease on January 12, 2022, at the age of 42. In July 2021, about six months prior to her death, Faith submitted a restitution affidavit requesting payment of expenses she had incurred by that time, including unreimbursed medical expenses and lost wages. Additionally, Faith and Scott requested restitution in the amount of $35,000 for the wages Scott lost for the

3

months he had cared for Faith based upon Scott's claim that he had given up employment to provide for her care.

¶5 In March 2022, Wolfchild and the State entered a plea bargain agreement resolving this charge by a plea of guilty and also resolving other pending charges against Wolfchild. For this charge, the agreement provided that the State would recommend "payment of any legally claimed restitution" as part of its sentencing recommendation. The District Court conducted two hearings regarding sentencing and restitution, at which Scott testified about he and Faith's expenses and his employment status. Wolfchild objected that Scott could not testify in support of the restitution request because he had not been named as executor of Faith's estate, which the District Court overruled. The District Court awarded a total of $44,450.50 in restitution, including $9,450.50 for Faith's claimed expenses, and $35,000 for Scott's claimed lost wages, reasoning "[t]he Court heard testimony and determined by a preponderance of the evidence Ms. Lantz and her husband sustained a pecuniary loss due to Defendant's criminal activity. Additionally, Ms. Lantz and her husband attempted to mitigate damages and the damages requested are not excessive, unreasonable, or outside statutory authority." Wolfchild appeals.

¶6 "Restitution awards create mixed questions of law and fact that we review de novo." *State v. Bertsch*, 2024 MT 250, ¶ 4, 418 Mont. 425, 557 P.3d 1251 (citation omitted). "We review the appropriateness of imposing restitution for correctness and the District Court's findings regarding the amount of restitution to determine whether they are clearly erroneous." *State v. Cleveland*, 2018 MT 199, ¶ 7, 392 Mont. 338, 423 P.3d 1074.

¶7 On appeal, Wolfchild initially challenged both the amount of restitution the District Court ordered for Faith, $9,450.50, and the entirety of the restitution, $35,000, awarded to Scott. However, Wolfchild has made concessions in her briefing that have narrowed the issues. In her reply brief, Wolfchild re-explains her position and states, "In sum, Ms. Wolfchild agrees that Ms. Lantz's Estate is entitled to restitution in the amount of $9,450.50 for her out-of-pocket expenses and lost wages," which is the amount awarded by the District Court for those claims. That leaves the $35,000 claimed by Scott for wages he lost when caring for Faith instead of working.

¶8 Wolfchild initially objected to Scott's testimony because he had not been appointed a representative of Faith's Estate. In her briefing, she now concedes that, "had Mr. Lantz proffered sufficient evidence to substantiate his claim, he would be a victim under [§ 46-18-243(2)(a)(i), MCA] as 'a person who suffer[ed] [a] loss of property . . . as a result of . . . the commission of an offense.'" Thus, the issue is narrowed to whether there was sufficient evidence to support the District Court's award of $35,000 for Scott's claimed lost wages.

¶9 A restitution award may be established, pursuant to § 46-18-242, MCA, by "an affidavit of loss by or testimony of the victim describing the victim's pecuniary losses." *Cleveland*, ¶ 12; *see also State v. Pierre*, 2020 MT 160, ¶ 13, 400 Mont. 283, 466 P.3d 494 ("The sentencing court may find the requisite causal nexus for restitution, between an offender's admitted or adjudicated criminal conduct and the asserted victim loss, upon an admission, by implication from proof of the elements of the charged offense, upon victim affidavits included with a PSI, or upon other evidence presented at or incident to

5

sentencing."). Scott's lost wages, covering the seven months he cared for Faith up to the time she submitted her restitution claim in July 2021, were first requested within Faith's affidavit, which was prepared by her counsel, was detailed at length, and supported by extensive documentation. In regard to Scott's involvement, the affidavit, filed while Faith was alive, stated:

> Husband assists with all activities & daily living . . . Ms. Lantz's neurologist, Dr. Trenay Hart estimates that it will be 12 -- 18 months from the date of the attack to determine the full extent of her injuries, and she will not be able to work during that time. Mr. Lantz is unable to work because he assists Ms. Lantz with all her daily living needs. Mr. Lantz has not worked since Ms. Lantz's attack. Please note that [Scott's] wage loss calculations [of $35,000] above do NOT include this future estimated loss of income.

¶10 Scott also testified in the two sentencing hearings, at which point Faith was deceased, and provided information about his care of Faith and the calculation of the claimed $35,000 in wages. About Faith's care, he testified:

> At home when I was taking care of her, she -- because of her vision problems and other problems with the TBI, she couldn't balance very well, I had to help get her dressed, in and out of bed, I had to help her get up from the living room chair, I had to help get her in and out of the bathtub, we had to get a shower chair for her because she couldn't stand in the shower. I had to help take care of her. I had to do everything around the house and cook for her and feed her. It was pretty much around the clock job, taking care of her.

Prior to Faith's injury, Scott had worked as a delivery driver, earning $60,000 per year, from which he calculated his usual wages to be $5,000 per month. Thus, the $35,000 claimed for lost wages was based upon Scott's usual monthly wage for the seven months he took care of Faith at home, from December 2020 to the time the claim was submitted in July 2021. At the time of Faith's injury, Scott was not then working, having sustained an on-the-job shoulder injury. Then, his actual former position was cut because the company

6

reduced services during the COVID pandemic. However, after surgical repair of his shoulder, he was in contact with employers and had received offers to return to work whenever he was available to do so, some paying more than he had earned at his prior position driving trucks. Scott explained these circumstances:

> Q.    So could you tell the Court a little bit about your working situation leading up to Faith's injury?
>
> A.    My working situation, I had injured myself, and I was going through therapy, and I ended up having to have a surgery on my shoulder, and Faith was taking care of me during that time, plus working at the same time, and I was recovering from the surgery to a point to where I could start to go out and look for a job myself, and then the assault happened.
>
> Q.    [W]hat were you doing when you got hurt for work?
>
> A.    I was a deliveryman for Alsco American Linen.
>
> Q.    And I know in Montana it's impolite to talk about money, but what was your hourly wage or salary?
>
> A.    My yearly salary was 60,000 a year. I had the largest route in the state . . . .
>
> .    .    .
>
> Q.    So you find out that COVID cutbacks has cost you a position to go back to; once you are feeling you are kind of capable and ready to go back to work, what were your prospects looking like? Had you applied for jobs or interviewed for jobs?
>
> A.    There were a couple different jobs that I could actually do. There was some jobs that I could operate heavy equipment that I could do, I've done that in the past, and that wasn't going to be an issue, and it could have been more profitable for me than the Alsco job, but because of Faith, I didn't want to leave her alone to her own devices while I was at work.
>
> Q.    Had you made contact with any of those construction companies or any of those outfits to talk to them about work?

7

A.    Yes, I did.

Q.    And how close were you to actually landing a job with them? Was it just a situation of showing up or describe that for the Court?

A.    Well, the people I talked to were managers on the -- with the company, and I could -- they said anytime I was ready to come on board with them, just to let them know.

Q.    Okay. You talked a little bit about your work experience prior to your injury, but really just as far as one job goes; could you describe for the Court what other kind of skills, what other kind of jobs you've done kind of throughout the course of your adult life?

A.    Through the course of my job career, I spent 17 years as an animal control officer with the Billings Police Department, I was a swift water river rescue tech, I'm a high and low angle rappelling rescue tech, I was a swift water river rescue and ice water rescue tech, I was a occult investigator for the Billings Police Department, I was a euthanasia tech for the State, I ran the crematorium for the animal shelter, I cremated drugs for the city, county and state.

When I left that job, I took a supervisor's job up at the airport. I was a manager of an air cargo operation up there for UPS, I worked for Edwards Jet Center -- I trained everybody on every piece of equipment up there, I managed the crew, I did scheduling -- we went through a lot of people every year, a couple hundred people every year, worked two different shifts up there, and I did that for 12 years, then I went to work at Alsco.

¶11   Wolfchild argues that "Mr. Lantz's restitution request is premised on the assumption that but for his staying home to take care of his wife, he could have earned $35,000 in the 7-month period from January 1–July 31, 2021. This assumption is unsupported by evidence in the record." She further contends that "the only evidence concerning Mr. Lantz's purported lost wages was his statement that he turned down a job operating heavy equipment. This single statement is insufficient to prove Mr. Lantz actually turned down a bona fide job offer." However, from our review of the record we conclude there was sufficient evidence presented, if believed, for the District Court to conclude that the claim

8

for $35,000 in lost wages had been established by a preponderance of the evidence, including the "requisite causal nexus for the restitution, between an offender's admitted or adjudicated criminal conduct and the asserted victim loss." *Pierre*, ¶ 13.

¶12     The Judgment lumped the restitution amounts together and awarded them to "Scott Lantz or the Estate of Faith Justice Lantz." In accordance with the claims as made and the findings entered by the District Court, the Judgment should state that $9,450.50 is awarded to the Estate of Faith Justice Lantz, and $35,000 is awarded to Scott Lantz, and we remand for entry of an Amended Judgment to this effect. Although we do not reach the issue here, in the event restitution is paid to the Estate of Faith Justice Lantz, and dependent upon other properties and circumstances, it may be necessary to initiate an informal probate proceeding or a summary administration procedure for small estates pursuant to §§ 72-3-1101 through -1104, MCA, for distribution of such proceeds.

¶13     We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review. The District Court's interpretation and application of the law were correct, and its findings of fact were not clearly erroneous.

¶14     Affirmed in part, reversed in part, and remanded for entry of an Amended Judgment.

/S/ JIM RICE

9

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON